| | |
|---|---|
| RANDOLPH J. BENDER and ) | |
| THI A. BENDER, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| BEACH REALTY OF NORTH ) | |
| CAROLINA, INC., d/b/a BEACH ) | |
| REALTY & CONSTRUCTION, ) | |
| Defendant. ) | |
| ) | |

This matter is before the court upon motion for summary judgment [DE-22] filed by Defendant Beach Realty of North Carolina, Inc. ["Beach Realty"]. Plaintiffs Randolph J. Bender and Thi A. Bender have responded [DE-27], Beach Realty has replied [DE-30] and this matter is now ripe for disposition.

## I. STATEMENT OF THE CASE

This dispute arises out of the construction of a beach house by Beach Realty for the Benders. The Benders initiated the instant action by filing a Complaint on May 1, 2006. Thereafter, on June 12, 2006, the Benders filed an Amended Complaint, alleging the following claims against Beach Realty: (1) negligence; (2) unfair trade practices; (3) breach of contract; (4) negligence per se; and (5) tortious interference of contract. Specifically, the Benders allege that Beach Realty, "despite repeated demands from the Benders, failed to complete the home in a timely fashion, and failed, during the construction process, to (i) comply with the design standards and specifications provided by the Benders and agreed to by [Beach Realty], (ii) dedicate adequate workmen and materials to the project; and (iii) perform acceptable oversight and supervision of the project." Amend. Compl. ¶ 20 [DE-7]. As a result of Beach Realty's failure to adequately complete their home, the Benders maintain that they have been damaged due to their inability to rent the beach house during the 2005 and 2006 tourist seasons or to secure a favorable fixed-rate mortgage. Additionally, the Benders allege that they suffered economic loss due to

material increases in the cost of materials and other commodities.

Beach Realty filed an Answer on June 21, 2006, asserting a breach of contract counterclaim against the Benders and seeking to perfect and enforce its lien pursuant to N.C. Gen. Stat. § 44A-8 *et seq.* Specifically, Beach Realty alleges that the Benders breached the contract by failing to pay invoices for materials and work completed on the beach house in the amount of $561,904.86. In the alternative, Beach Realty seeks recovery in quantum meruit. On February 1, 2007, Beach Realty filed a motion for summary judgment, arguing that it is entitled to summary judgment as to its breach of contract and lien counterclaims and the claims asserted by the Benders. This matter is now ripe for disposition.

## II. STATEMENT OF THE FACTS

In the fall of 2002, the Benders met with James C. Ward, President of Beach Realty, to discuss the construction of an ocean-front home on property previously purchased by the Benders. Over a period of several weeks, the Benders and Ward discussed Beach Realty's expertise in the construction of custom homes, the level of supervision that would be undertaken by Ward personally over the project, the length of time that would be required to complete construction and the projected cost of the home.

On September 17, 2003, the Benders and Beach Realty executed a Cost-Plus Contract, which provided that Beach Realty would construct the Benders' home. The Cost-Plus Contract provided the following terms relevant to this action:

Paragraph 2
**BEST EFFORTS**

Contractor[1] promises to use his best skill and judgment in furthering the interests of Owner.[2] He agrees to use his best efforts at all times to furnish an adequate supply of workmen and materials, and to perform the work in the most expeditious and economical available manner consistent with the interests of the Owner.

Paragraph 3

---

[1] The Cost-Plus Contract identifies Beach Realty as the "Contractor."

[2] The Cost-Plus Contract identifies the Benders as the "Owner."

2

## COMMENCEMENT OF CONSTRUCTION

. . .

Contractor shall exercise due diligence to complete the work as herein provided no later than 270± days from the beginning of physical construction, but Contractor shall not be liable for delays due to acts of God, strike, failure of delivery of materials, and other causes beyond his control.

Paragraph 4
**FEE TO CONTRACTOR**

The Owner agrees to pay Contractor in U.S. dollars a fee of fifteen percent (15%) of the total cost of construction which fee shall be paid monthly. The fee shall be paid by Owner no later than the fifth day of each month and shall be calculated on the total cost of construction paid during the preceding month.

The Contractor shall, at least ten days before each payment falls due, deliver to the Owner an itemized statement showing in complete detail all monies paid out or costs incurred by him on account of the cost of construction during the previous month for which he is to be reimbursed, and the amount of the contractor's fee due together with payrolls for all labor and other data supporting the contractor's right to payment for subcontract or materials.

. . .

Paragraph 8
**TERMINATION**

The contract may be terminated by the Contractor or Owner for substantial breach which shall include failure of Owner to make timely payment to Contractor.

If the Owner terminates the contract he shall reimburse the Contractor for any unpaid cost of work due him plus the unpaid balance of the fee computed upon the cost of construction to the date of termination. [T]he Owner shall also pay to the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment retained. In the case of such termination of the contract the Owner shall further assume and become liable for obligations, commitments and unsettled claims that the Contractor has previously undertaken or incurred in good faith in connection with said work. The Contractor shall, as a condition of receiving the payments, execute and deliver all such papers and take all such steps, including legal assignment of his contractual rights, as the Owner may require for the purpose of fully vesting himself the rights and benefits under the Contract such obligations or commitments.

Paragraph 10
**OCCUPANCY**

3

Case 2:06-cv-00012-DAN   Document 42   Filed 09/26/07   Page 3 of 18

> Prior to Contractor issuing "Certificate of Occupancy" to Owner, Owner will walk through house with Contractor or his representative and compile a "punch list." Also Owner will complete a "reconciliation" with Contractor's accounting department at this time. At the completion of the above mentioned items, "Certificate of Occupancy" shall be issued to Owner.
>
> Paragraph 11
> **WARRANTY**
>
> Contractor only warrants to Owner and no others that all materials and equipment will be new unless otherwise specified and that all work will be of good quality and free from faults or defects. This warranty shall be limited to one calendar year from completion or occupancy of structure. There shall be no warranty in the event of termination. Owner shall upon divestiture of structure advise any new Owner that Contractor makes no warranties of any sort.

Mot. for Summ. J. [DE-22], Tab A.

Following execution of the Cost-Plus Contract, Beach Realty, through Ward, recommended two designers that Ward believed were capable of drafting design specifications for the home. Of these two designers, the Benders chose Florez & Florez. In early 2003, Florez & Florez began the design process, with Mike Florez acting as the Benders' primary contact person and Mark Miller acting as the designer. Due to delays in finalizing the plans, the Benders ultimately terminated their relationship with Florez & Florez. The plans prepared by Florez & Florez were sealed by an engineer in October of 2003 and Beach Realty commenced construction in February of 2004.

The parties do not dispute that construction of the house was beset with delays from the outset. When construction began, Jim Barkley acted as the superintendent of the project and was primarily responsible for the day-to-day management and coordination of subcontractors, the delivery of materials and other duties. Barkley did not maintain any progress reports, job logs, time records or other records reflecting the progress of construction, scheduling of subcontractors or change orders.

On July 5, 2004, Barkley, on behalf of Beach Realty, signed off on the plans that were used by Arcways, Inc. ["Arcways"] to fabricate staircase components for the Benders' home. Barkley continued to serve as project supervisor until his death in the fall of 2004. Ward subsequently assumed

4

superintendent duties with Matt Shealey, also of Beach Realty, acting as construction supervisor.

Problems arose during construction when staircase components sent by Arcways did not fit properly and installation of the staircase required removal of a load-bearing column. The parties dispute who is at fault for the problems related to the staircase and the construction delays during this period.

Unsatisfied with the progress of construction, the Benders retained Raymond A. Yancey, owner of a company holding a Class A contractor's license, in November of 2004 to supervise the project on their behalf. According to the Benders, Yancey observed that little to no work was done on the home from November 9, 2004 until January 31, 2005 and that there were no subcontractors or Beach Realty personnel on site to oversee construction. The Benders contend that, while Beach Realty was attempting to fit the staircase, little if any additional work was performed on the project and the standstill continued until at least March of 2005. The Benders attribute the delays to Beach Realty's failure to dedicate adequate workmen and materials to the project and to perform acceptable oversight and supervision of the project. Beach Realty, however, contends that construction delays were caused by the Benders' frequent modifications to the stairway and other design features. Additionally, during this same time period, Beach Realty maintains that the Benders began falling behind on payments due under the Cost-Plus Contract.

Beginning in the summer of 2005 and continuing through November of 2005, the parties engaged in numerous efforts to resolve their disputes surrounding completion of the house, including the correction of warranty items and a settlement of outstanding claims related to the Cost-Plus Contract and construction process. During these discussions, the parties verbally modified the terms of the Cost-Plus Contract. The parties do not dispute that Beach Realty agreed to waive its right to recover 18% interest on the unpaid balance due and to reduce its contractor's fee from 15% to 13%. The parties do, however, dispute verbal modifications to the Cost-Plus Contract regarding the payment terms. The Benders maintain that they verbally agreed to make the final payment upon completion of the house. Beach

5

Realty, however, contends that the Benders agreed to make the final payment upon receipt of the Certificate of Occupancy.

Beach Realty obtained the Certificate of Occupancy on September 9, 2005, but the Benders did not pay the final balance owed. Thereafter, the parties met on November 3, 2005 in an attempt to resolve ongoing disputes. At the meeting, the parties agreed that the Benders and Ward would meet to prepare a "punch list," describing outstanding items requiring repair. The next day, Robert L. Outten, counsel for Beach Realty, sent a letter to the Benders which provided:

> This letter is to follow our conference in my office on November 3, 2005. After discussing a number of issues, it was decided that you and Jimbo Ward of Beach Realty & Construction would meet at the premises on Tuesday, November 8, 2005 at 9:30 a.m. At that time, the two of you are going to prepare a punch list of the remaining items that need to be completed in order to finish the house. At that meeting, Jimbo will also endeavor to give you an estimated time frame, barring any changes, to complete the punch list items.
>
> There is currently approximately $400,000.00 due from you to Beach Realty & Construction under the terms of the Contract. This amount substantially exceeds the cost of completion. As Jimbo and I explained in our meeting, Beach Realty is unwilling to continue construction while it is still owed a sum this large. It is reasonable for you to add a retainage which approximates the cost of completion. After the punch list is completed, it is Beach Realty's hope that number can be agreed upon. **However, Beach Realty will not proceed further until it has been paid all of the sums which it is due with the exception of the agreed upon retainage.**
>
> As we have discussed in the past, and as you and Jimbo have discussed on numerous occasions, everyone is working towards the same goal and that is to complete your house. Jimbo remains willing to continue working with you in an amicable manner in order to meet these goals.

Mot. for Summ. J. [DE-22], Tab B, Ex. 9152 (emphasis added).

The Benders and Ward met on November 8, 2005 to create the "punch list." Following the Benders' receipt of Outten's letter, however, the parties apparently reached an impasse. As reflected in Outten's letter, the Benders understood that Beach Realty would not continue construction until it had been paid the outstanding sums due. Mot. for Summ. J. [DE-22], Tab B, pp. 213-14. The Benders refused to pay Beach Realty and attempted to complete the beach house themselves by individually

6

contracting subcontractors necessary to finish the project and prepare it for the summer rental season. According to the Benders, Ward threatened a number of his subcontractors, including Gill Myers, Jerry Stovall, Mike Bowling, Cliff Neal, Nick Bakapoulous and others, that if they continued to work on the Benders' home, Beach Realty would not pay them for work previously completed for Beach Realty and would not employ them for future projects. As a result of these alleged threats, the Benders contend that they had difficulty contracting with subcontractors and could not get the house completed before the 2006 summer rental season.

Beach Realty, however, maintains that it continued to work on the house and that the last project done at the site was on March 2, 2006, when Beach Realty directed Macko Construction to replace three windows located on the back of the house. The Benders contend that they informed Ward that they did not want the windows replaced and maintain that Beach Realty did not complete any work on the home after November of 2005. To date, the Benders have not paid the alleged outstanding balance owed to Beach Realty.

### III. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will

bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. ANALYSIS

In its motion for summary judgment, Beach Realty maintains that there are no genuine issues of material fact with respect to its breach of contract and lien counterclaims. Additionally, Beach Realty contends that summary judgment is appropriate with respect to each of the Benders claims, which include: (1) negligence; (2) unfair trade practices; (3) breach of contract; (4) negligence per se; and (5) tortious interference of contract. The court will examine each of these claims in turn.

### A. Beach Realty's Counterclaims

#### 1. Breach of Contract

Beach Realty has alleged a breach of contract counterclaim against the Benders, maintaining that they "breached the contract by failing and refusing to pay [Beach Realty's] invoices for amounts owing under the contract." Answer ¶ 8 [DE-8]. Beach Realty contends that the Benders breached paragraph 8 of the Cost-Plus Contract which provides that "[t]he contract may be terminated by the Contractor or Owner for substantial breach which shall include failure of Owner to make timely payment to Contractor." Mot. for Summ. J. [DE-22], Tab A, ¶ 8.

Beach Realty has moved for summary judgment as to this claim, arguing that no genuine issues of material fact remain regarding the Benders' failure to pay Beach Realty the outstanding balance due after issuance of the Certificate of Occupancy. Because the Cost-Plus Contract unambiguously provides that the failure to make timely payment constitutes a substantial breach, Beach Realty asserts that it is entitled to summary judgment as to this claim.

"In order to prevail on a claim for breach of contract, a plaintiff's evidence must show a valid contract existed between the parties, the defendant breached the terms of the contract, the facts constituting the breach, and damages resulted from the breach." *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.*, 545 S.E.2d 745, 751 (N.C. Ct. App. 2001). Here, having carefully examined the parties'

8

motions and the facts of this case, the court concludes that genuine issues of material fact remain regarding whether the Benders breached the terms of the contract with Beach Realty.

As described above, the parties verbally modified the Cost-Plus Contract in an effort to resolve ongoing disputes regarding construction of the home. The parties, however, dispute the terms that were agreed upon. Specifically, the parties disagree as to whether the Benders agreed to pay Beach Realty the outstanding balance upon issuance of the Certificate of Occupancy or upon Beach Realty's completion of construction. Because the court cannot determine, as a matter of law, what terms the parties agreed to, the court cannot conclude that the Benders breached those terms. Consequently, Beach Realty's motion for summary judgment as to its breach of contract counterclaim is DENIED.

### 2. Lien

Beach Realty also seeks summary judgment as to its claim of lien made pursuant to N.C. Gen. Stat. §44A-8, which provides:

> Any person who performs or furnishes labor or . . . materials . . . pursuant to a contract, either express or implied, with the owner of real property for the making of an improvement thereon shall, upon complying with the provisions of this Article, have a right to file a claim of lien on real property on to secure payment of all debts owing . . . pursuant to the contract.

N.C. Gen. Stat. § 44A-8. The court finds that summary judgment is not warranted with respect to Beach Realty's lien, as genuine issues of material fact remain regarding the timeliness of the lien. A claim of lien must be filed "not later than 120 days after the last furnishing of labor or materials at the site of the improvement by the person claiming the lien." N.C. Gen. Stat. § 44A-12. Beach Realty filed its lien on May 19, 2006. The only work performed by or on behalf of Beach Realty within the 120 day period preceding the filing of the claim of lien was the replacement of three windows by Macko Construction in March 2006 at a cost of approximately $350.00. The Benders argue, however, that the lien was untimely because the March 2006 window replacement cannot be used to extend the deadline for filing of the lien.

North Carolina courts have established that, "[w]here the time allowed for filing a lien has begun

9

to run, the claimant cannot thereafter extend the time within which the lien may be filed by doing or furnishing small additional items for that purpose." *Priddy v. Kernersville Lumber Co., Inc.*, 129 S.E.2d 256, 260 (N.C. 1963). Rather, "the [last] work performed and materials furnished must be required by the contract, and whatever is done must be done in good faith for the purpose of fully performing the obligations of such contract." *Id.* (internal citations omitted).

Here, the Benders have offered evidence upon which a reasonable jury could conclude that the March 2006 window installation was done merely for the purpose of extending the time for filing the lien. Beach Realty's contention that the windows were installed in good faith is belied by Otten's November 3, 2005 letter indicating that Beach Realty would conduct no further work on the Bender residence until receiving payment and Mr. Bender's testimony that he never agreed to installation of the windows. *Id.* at 261 ("Whether the materials furnished after the contract had been substantially completed were in good faith and for the purpose of completing the contract or colorably to revive the lien is a question of fact."). Accordingly, Beach Realty's motion for summary judgment as to its claim to enforce its lien is DENIED.

## B. The Benders' Claims

### 1. Breach of Contract

The court first turns to the Benders' claim that Beach Realty breached the contract by:

> failing to build the Benders' home in accordance with the plans and specifications and the contract terms: by failing to complete the project in a timely manner as set forth in the Contract: by not conducting and completing the work in a workmanlike manner and in compliance with all building codes and other applicable laws: by failing and refusing to warrant its work for a period of 12 months following completion: and by not acting consistent with the requirement of good faith and fair dealing.

Amend. Compl. ¶ 41 [DE-7]. Beach Realty has moved for summary judgment as to this claim on the grounds that Beach Realty was relieved of its obligation to perform when the Benders breached the Cost-Plus Contract by failing to make timely payments or when the Benders repudiated the Contract by filing suit.

10

"The general rule governing bilateral contracts requires that if either party commits a material breach of the contract, the other party should be excused from the obligation to further perform." *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 358 S.E.2d 566 (N.C. Ct. App. 1987). A breach of contract may also occur by repudiation, which "is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties." *Id.*

The court finds that Beach Realty's motion for summary judgment as to the Benders' breach of contract claim must fail, as several factual issues remain regarding the terms of the agreement between the parties and whether Beach Realty or the Benders breached those terms. In moving for summary judgment, Beach Realty argues that there is no genuine issue of material fact regarding whether it breached the contract by unreasonably delaying construction because, "[a]ny delays were occasioned by structural changes to the stairway by the Benders on several occasions, and numerous changes and additions by the Benders in the design and specifications are explained in detail in the Bender, Ward and Hunter depositions." Mem. in Support of Mot. for Summ. J. [DE-21] at p. 5. The court, however, need not parse through the record to find facts sufficient to support Beach Realty's argument. As the movant, it is Beach Realty's burden to establish that summary judgment is appropriate. Having failed to cite to any specific facts in support of its argument, the court finds that summary judgment is not warranted as to this claim.

Moreover, not only are there issues of fact regarding the construction delays, but there remain factual issues regarding whether Beach Realty adequately supervised the project, conducted the work in a workmanlike manner, warranted its work, and acted in good faith as required by the Cost-Plus Contract. It will be for a jury to assess the terms of the Cost-Plus Contract, as modified by the parties, and whether Beach Realty or the Benders breached those terms. Because there are genuine issues of material fact with respect to the Benders' breach of contract claim, Beach Realty's motion for summary judgment is DENIED as to this claim.

### 2. Negligence and Negligence Per Se

The Benders did not respond to Beach Realty's motion for summary judgment concerning their claims of negligence and negligence per se, apparently conceding that they have not stated claims of negligence or negligence per se. For the reasons stated in Beach Realty's memorandum in support of motion for summary judgment, which the court adopts and incorporates herein, the motion for summary judgment is ALLOWED with respect to the Benders' negligence and negligence per se claims. *See* Fed. R. Civ. P. 56(e)("If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

### 3. Tortious Interference of Contract

The Benders also allege a claim of tortious interference of contract. Specifically, the Benders maintain that Ward, on behalf of Beach Realty, tortiously interfered with their contract with subcontractor Jerry Stovall to install a handrail. To establish a claim for tortious interference with contract, a plaintiff must demonstrate:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damages to plaintiff.

*Beck v. City of Durham*, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002). Beach Realty argues that the Benders' claim for tortious interference of contract must fail because the Benders have not proffered sufficient evidence with respect to the third, fourth and fifth elements of their claim. The court disagrees with Beach Realty and finds that the Benders have raised genuine issues of material fact with respect to each of the elements of their tortious interference of contract claim.

With respect to the third factor, requiring the Benders to establish that Ward intentionally induced a third person not to perform on a contract, the Benders have proffered sufficient evidence to survive summary judgment. As described above, in November of 2005, the Benders undertook to

12

complete the house themselves by individually contacting subcontractors necessary to finish the project. The Benders entered into a contract with Stovall, a carpenter who has worked on a few projects for Beach Realty. The Benders contend that Ward interfered with this contract by threatening Stovall that if he worked for the Benders, he would not be paid for work previously completed for Beach Realty and would not receive future opportunities from Beach Realty. According to the Benders, Ward's threat caused Stovall to terminate his contract with the Benders.

In support of their argument, the Benders point to the depositions of Stovall and Ward. During his deposition, Ward acknowledged speaking with Stovall and other subcontractors about completing work independently for the Benders. In describing his communication with another subcontractor, Gill Myers, Ward explained:

> A. If Gill decided to go do something for Randy and April, that would be between them and Gill.
>
> Q. Okay. My question was, though, would that impair Mr. Myers' ability to work with you in the future.
>
> A. I don't know. Sitting here today, I don't know.
>
> Q. You can't say that it would or wouldn't?
>
> A. No.

Response to Mot. for Summ. J. [DE-27], Tab F, p. 53. When asked whether he "would . . . have any problem with Mr. Stovall continuing to work on the Bender project," Ward answered:

> Well, like I said before, I can't sit here and tell you how I'd react to what somebody did. Jerry doesn't do that much work for me – one project a year, maybe two. And whether he goes back or doesn't go back to do the stuff that I hired him to do, I've told them all the same thing, which I've shared with you. And did I deliver that perfect? I might have had a bad day and yelled at somebody instead of delivering it in a nice flowery speech, depending on the circumstances.

*Id.* at p. 65. Elaborating, Ward continued:

> A. My intent was to try to give my subcontractor an answer to the question that they had – which was what do I do – what are you going to do about paying me and what do I do about the phone calls I'm getting from Randy and April; and if I go to work on Randy

13

and April's house, are you going to write me the check?

Q. How did you respond?

A. No.

*Id.* at p. 68. Additionally, Stovall testified that he called Ward before entering into an agreement with the Benders, out of concern for Ward as a friend and for their future working relationship. *Id.* at Tab J, p. 26-27. Stovall, however, indicated that Ward did not condition his ability to get paid on not working with the Benders. *Id.* at p. 26. Moreover, when asked why the agreement with the Benders terminated, Stovall testified that, "[i]t came to an end in my inability timeframe wise and physically to complete the last bit of it." *Id.* at p. 19.

Based upon this testimony, the court finds that the Benders have raised a genuine issue of material fact regarding whether Ward threatened Stovall, causing Stovall to terminate his agreement with the Benders, as it is for the jury to interpret Ward's comments to Stovall. Ward's comments could be interpreted as suggesting that Stovall, in entering into a separate agreement with the Benders, would be paid by the Benders and not Beach Realty. On the other hand, Ward's comments could also be interpreted as threatening Stovall that he would not be paid for past work if he entered into an agreement with the Benders. Additionally, it will be for the jury to determine the credibility of Stovall's statements regarding why he terminated his agreement with the Benders.

Regardless, Beach Realty argues that the Benders have failed to come forward with sufficient evidence regarding whether Ward acted without justification. To establish this element, the Benders must prove that Ward had no motive other than malice when making the alleged communications. *Beck*, 573 S.E.2d at 191. As this court has already stated, it will be for the jury to evaluate Ward's statements to Stovall and the motive therefor.

Finally, Beach Realty argues that the Benders have not proffered sufficient evidence of the fifth element of their claim, actual damages. According to Randolph Bender's affidavit, the monetary loss

14

resulting from the alleged tortious interference was the inability to rent the house during the summer of 2006 due to an absence of railings on the central staircase. Mr. Bender represents in his affidavit that the Benders, through a leasing agent, had "accepted deposits for the spring and summer of 2005 that would have represented total gross rental income of $75,000." Response to Mot. for Summ. J. [DE-27], Tab D, ¶ 18. *Id.* at ¶ 19. The Benders also maintain they were "required to suspend efforts to seek renters for the 2006 tourist season," but have been able to secure renters for the 2007 season *Id.* at ¶ 27. Mr. Bender thus posits that "[g]iven that the home was substantially booked for the 2007 rental season, it is reasonable to conclude that had the home been available in early and mid-2006, it would have generated rental income in excess of $150,000 during the prime months in 2006." *Id.*

Relying on *Castle McCulloch, Inc. v. Freedman*, 610 S.E.2d 416, 420 (N.C. Ct. App. 2005), Beach Realty argues, for the first time in its reply in support of the motion for summary judgment, that the Benders have failed to sufficiently establish the issue of damages because the Benders' evidence of lost rental income is inadmissible if based on assumptions generated in other years. First, the court notes that Beach Realty has somewhat misconstrued the *Castle McCulloch* case, which did not hold that all evidence regarding rental income from other years is *inadmissible*. Rather, the *Castle McCulloch* court stated that "lost profits" damages must be proven with "reasonable certainty" and must not be " 'based upon hypothetical or speculative forecasts of losses.' " *Id.* at 501-502 (quoting *Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 431 S.E.2d 767, 770 (N.C. Ct. App. 1993)). Second, the court notes that Beach Realty raised the issue of damages for the first time in its Reply. Because Beach Realty has effectively raised the issue when the Benders would not have an opportunity to respond, the court declines to consider the argument at this juncture. *See, .e.g, Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734-735 (D. Md. 2001)(citing cases and stating that "[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered"). The court reminds the Benders, however, that at trial they will have the burden of coming forward with sufficient

evidence from which a jury could calculate, with reasonable certainty, the lost rental income for 2006. *See Iron Steamer, Ltd. v. Trinity Restaurant, Inc.*, 431 S.E.2d. 767, 770(N.C. Ct. App. 1993)(reviewing North Carolina's law with regard to proving damages with "reasonable certainty" in the context of a newly-opened business).

In sum, the court concludes that the Benders have proffered sufficient evidence to proceed with their tortious interference with contract claim, and consequently Beach Realty's motion for summary judgment is DENIED as to that claim.

### 4. Unfair Trade Practices

Beach Realty also moves for summary judgment on the Benders' claim under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.* ("UDTPA"). North Carolina's UDTPA provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive practices, in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75.1-1(a). To establish a claim under UDTPA, a plaintiff must show that (1) the defendant committed an unfair or deceptive trade act or practice; (2) the action in question was in or affecting commerce; and (3) that act proximately caused injury to the plaintiff. *See First Union Nat'l Bank v. Brown*, 603 S.E.2d 808, 818 (N.C. Ct. App. 2004). The presiding judge decides as a matter of law whether a defendant's conduct, as determined by the jury, constitutes an unfair or deceptive trade practice. *See Medina v. Town & Country Ford, Inc.*, 355 S.E.2d 831, 836 (N.C. Ct. App. 1987), *aff'd per curiam*, 364 S.E.2d 140 (N.C. 1988). Conduct is "unfair" if it offends established public policy or is otherwise "immoral, unethical, oppressive, unscrupulous, or substantially injurious." *See Gatx Logistics, Inc. v. Lowe's Companies, Inc.*, 548 S.E.2d 193, 197 (N.C. App. 2001). It is deceptive if it has the capacity or tendency to deceive a reasonable person. *See Jones v. Capitol Broad. Co.*, 495 S.E.2d 172, 175 (N.C. Ct. App. 1998).

In this case, the Benders contend that Ward, in his capacity as a President of Beach Realty, engaged in unfair and deceptive trade practices within the meaning of UDTPA when he "confronted

subcontractors that had worked on the Bender project and told them that if they went to work for the Benders independent of Beach Realty they would not be paid." Response to Mot. for Summ. J. [DE-27] at p. 23. As evidence of Ward's alleged threats, the Benders point to Ward's deposition testimony, described above.

In moving for summary judgment, Beach Realty first argues that the Benders have failed to raise a genuine issue of material fact regarding whether Ward actually threatened any subcontractors. The court already has concluded that the Benders have proffered evidence upon which a jury could conclude that Ward threatened subcontractors not to perform or accept contracts with the Benders for further work on the home.

Beach Realty next argues that Ward statements cannot "qualify as unfair and deceptive." Reply in Support of Mot. for Summ. J. [DE-30] at p. 6. To the contrary, however, North Carolina courts have made clear that the same conduct that forms the basis for an tortious interference claim may be "unfair" or "deceptive" within the meaning of UDTPA. *See, e.g., United Laboratories v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988)(rejecting appellant's argument that UDTPA was inapplicable to tortious interference claims); *Roane-Barker v. Southeastern Hosp. Supply Co.*, 392 S.E.2d 663, 670 (N.C. Ct. App. 1990)("Because defendants' acts did amount to tortious interference with contract, as in *Kuykendall*, the court did not err in finding an unfair and deceptive trade practice."). Here, the court concludes that the Benders' allegations regarding tortious interference, if found by the jury, constitutes an unfair practice within the meaning of UDTPA.

Finally, Beach Realty reiterates the damages argument regarding the inadmissibility of "assumptions" evidence. For the reasons discussed above, the court decline to consider the untimely argument at this juncture. Accordingly, Beach Realty's motion for summary judgment is DENIED as to the Benders' UDTPA claim.

C. Request for Rule 56(d) Findings

17

Finally, Beach Realty's request that the court enter partial summary judgment pursuant to Rule 56(d) is DENIED, for the above-stated reasons.

## V. CONCLUSION

Based on the foregoing, it is therefore ORDERED that Beach Realty's motion for summary judgment [DE-21] is ALLOWED in part and DENIED in part. The motion is ALLOWED with respect to the Benders' negligence and negligence per se claims and is DENIED in all other respects.

The court is cognizant that the parties previously reached an impasse at a mediated settlement conference, but after reviewing the record and the parties' arguments, the court is resolved that this matter be referred for a court-hosted settlement conference. Accordingly, Magistrate Judge David W. Daniel hereby is APPOINTED settlement master, and is DIRECTED to consult with counsel and to schedule a settlement conference on or before **November 15, 2007**. The settlement conference shall be conducted pursuant to the provisions of Local Civil Rule 101 (E.D.N.C.). The court will direct the Clerk of Court to schedule this matter for trial and pre-trial conference, if needed, after the settlement conference is concluded.

SO ORDERED.

This, the 26 day of September, 2007.

James C. Fox
Senior United States District Judge